

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Paul Riley*  Suite 400  DIRECT: 410-209-4959
*Assistant United States Attorney*  36 S. Charles Street  MAIN: 410-209-4800
*Paul.Riley@usdoj.gov*  Baltimore, MD 21201-3119  FAX: 410-962-3091

November 9, 2021

**BY ECF**

The Honorable George J. Hazel
United States District Judge
United States District Court for the District of Maryland
6500 Cherrywood Lane, Suite 445A
Greenbelt, MD 20770

Re:   *United States of America v. Jashon Fields*, No. GJH-18-335

Dear Judge Hazel:

The Government writes this letter in advance of the sentencing of Defendant Jashon Fields, which is currently scheduled for November 23, 2021 at 10:00 AM.

On September 16, 2021, Fields and his co-defendants Kamar Beckles and Demar Brown were convicted on all counts of the Second Superseding Indictment (the "Indictment"), which charged Brown, Beckles, and Fields with Conspiracy, pursuant to 18 U.S.C. § 371 (Count One), and Brown and Beckles with three counts of Interstate Transportation of Stolen Property, pursuant to 18 U.S.C. § 2314 (Counts Two to Four).

As set forth more fully below, the Government requests that the Court sentence Defendant to the statutory maximum sentence of five years' imprisonment in connection with his conviction on Count One.[1]

### I.   Background

The presentence investigation report ("PSR") filed October 15, 2021 (ECF No. 255) sets out the facts proven at the trial in this matter in detail.  In short, Defendant was part of a conspiracy that involved the burglary of 20 homes in two states and the theft of hundreds of thousands in dollars in property.  Defendant himself was involved with the burglary of six homes—three in Georgia on the evening of January 24, 2018 and three in Baltimore County on January 25, 2018 and January 26, 2018.

Defendant was arrested along with his cousin Demar Brown and co-defendant Kamar Beckles on the evening of January 26, 2018, after Defendant and Beckles burglarized two homes in Phoenix, Maryland.  Brown, the getaway driver, was arrested separately, after being apprehended in his Ford Explorer; the SUV contained an incredible amount of burglary tools and a host of property that had been stolen from residential homes over the course of the preceding two months.

---

[1] The Government has notified all victims of Defendant's sentencing date and has sought both requests for restitution and victim impact statements.  At this time, it is unclear whether any of the victims will be present for sentencing, though at least two have expressed a desire to attend.  We have to date received no requests for restitution.

The facts at trial proved that Defendant, along with his two co-defendants, burglarized two homes in Baltimore County on January 26, 2018 and a single home (13050 Jerome Jay Drive, Cockeysville) the night prior, January 25, 2018. From 13050 Jerome Jay Drive, the Defendants made away with more than $165,000 worth of jewelry and watches, among other things, and cash. While some of this property was ultimately recovered from one of the hotel rooms rented by the Defendants, certain important personal property and the vast majority of the cash was not recovered.

Defendant's participation in this criminal conspiracy did not begin in Baltimore County, however. The evidence at trial proved that, the night prior to the burglary of 13050 Jerome Jay Drive, the Defendants on January 24, 2018, committed three burglaries in Milton and Alpharetta, Georgia, not far from where Defendant lived. Indeed, the *only* defendant who lived in the Atlanta area was Defendant. Defendant and Beckles broke through the doors of the residences in Georgia, stole jewelry from two of the homes, and from one of the homes stole over $2,000 in loose change, which would go on to be recovered from Brown's SUV. Brown served as the getaway driver in connection with the Georgia burglaries. After the burglaries the defendants stayed at Fields' residence in Atlanta—before making their way to Baltimore County to continue their burglary spree.

Defendant's intent to burglarize homes as part of the conspiracy charged in the Indictment was established well before January 24, 2018. Indeed, text messages recovered from phones belonging to Defendant and Brown showed that Fields and Brown discussed the idea of burglarizing homes as early as November 20, 2017.

For sentencing purposes, however, Defendant's conduct was not limited to those six burglaries. Indeed, Defendant engaged in significant obstructive conduct—beginning with a materially false affidavit he filed with the court in November of 2018 and continuing through his false testimony at trial this past September. The clear and obvious intent of that false testimony was to mislead the Court and the jury in an attempt to exculpate co-defendant Brown, the ringleader of the criminal enterprise. The severity of this obstructive conduct cannot be overstated—Defendant knowingly and deliberately attempted to subvert the judicial process through his multiple false statements under oath.

## II.     Guidelines Computation

Under the U.S. Sentencing Guidelines, the Defendant's offense level under the PSR as to Count One—Conspiracy—in violation of 18 U.S.C. § 371—is correctly calculated at a final level of 26. PSR ¶ 133.

### A. Loss Amounts And Victims

The base offense level is 6 pursuant to U.S.S.G. §§2X1.1(a) and 2B1.1(a)(2). PSR ¶ 123. Further, all enhancements and adjustments included in the PSR are appropriate.

The loss in this case was well in excess of $550,000[2] but below $1,500,000 as established by trial testimony from the victims and the Government's exhibits at trial; there is thus a 14-level increase to the offense level under U.S.S.G. § 2B1.1(b)(1)(H). PSR ¶ 124. Likewise, because the offense involved more than ten victims, the offense level is increased by another two levels under U.S.S.G. § 2B1.1(b)(2)(A)(i). PSR ¶ 125.

---

[2] The PSR contains a typographical error; it references $5,500 rather than $550,000.

### B. Sophisticated Means

The offense involved sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C), so the offense level is increased by another two levels. PSR ¶ 126. The Guidelines clarify that "sophisticated means" as used in this section "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 (b)(10) cmt. n.9(C). While the enhancement requires more than "the concealment or complexities inherent in fraud," *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014), a defendant need "not utilize the most complex means possible to conceal his [criminal] activit[y]." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012). "The court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond ...) the concealment inherent in ... fraud." *Id.* (internal quotation marks omitted). Examples of such "sophisticated means" include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1(b)(10) cmt. n.9(C). The enhancement applies when the entirety of the scheme constitutes "sophisticated means," even if each individual action does not prove sophisticated. *United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017); *United States v. Merilia*, 640 F. App'x 239, 241 (4th Cir. 2016) ("[A] defendant's individual actions need not be sophisticated; what matters is the sophistication of the scheme as a whole.").

Here, there is no question that the offense conduct was sophisticated. The offense involved the burglaries of numerous homes in two states (Maryland and Georgia), the concealment of the fruits of certain of the burglaries at various locations in two states (Maryland and North Carolina),[3] and the transportation of stolen property across states lines where the evidence at trial established that the stolen items would go on to be sold. For example, the trial evidence established that the day after the December 18 burglary at the residence located on Ventry Farm Court, that a device associated with Brown was in the Diamond District in Manhattan—an international marketplace for the sale of jewelry. Text messages on devices associated with Brown and Beckles introduced at trial likewise indicated that Brown and Beckles intended to sell the items they stole. A vast majority of the jewelry, watches, and other items taken during the burglaries at issue in this case were never recovered by law enforcement; nor were the proceeds of any sale of the items located—indicia of the Defendants' success at concealing their criminal behavior.

The sophisticated means enhancement is likewise supported by the Defendants' use of two-way radios and numerous cell phones in connection with the offense—including the nine phones seized by law enforcement—the apparent purpose of which was to conceal their criminal activity from law enforcement and execute their scheme. Indeed, none of the seized phones were subscribed in the name of any of the Defendants. Rather, they were subscribed in names such as Dark Night, John Bravo, Johnny Bravo, Bob Dillan, Damian Black, and Bob Barker, and Jay Jay. The enhancement is likewise supported by the Defendants' modus operandi in connection with the burglaries they executed—conducting research on the areas they would go on to burglarize and frequently conducting surveillance on victims to determine whether the victim was home. *Cf. United States v .Savage*, 885 F.2d 212, 228 (sophisticated means appropriate where, among other things, defendant "hid assets, hid transactions, hid his own name, had phones registered in multiple states (none in his name)" and used "coordinated steps to circumvent the bank's fraud countermeasures").

---

[3] The fruits of certain of the burglaries in Maryland were concealed within nightstands at the Days Inn in Towson, Maryland. They were so well concealed that law enforcement did not locate the items during their initial search at the location. Further, the fruits of other burglaries were located in two separate locations in Winston-Salem, North Carolina—720 Hudson Street and 4447 Old Carver School Road.

### C. Obstruction of Justice

The PSR also includes a two level enhancement pursuant to U.S.S.G. § 3C1.1 in light of Defendant's conduct constituting obstruction of justice before and during trial—his filing of a false affidavit with the Court, ECF No. 49, and his false testimony at trial. This enhancement is properly accounted for in the PSR too.

Section 3C1.1 provides for a two-level increase if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." "A wide range of conduct falls within the parameters of this section." *See United States v. Hicks*, 948 F.2d 877, 883 (4th Cir. 1991). The commentary to Section 3C1.1 contains a non-exhaustive list of examples of the types of conduct covered by the guideline, including "providing materially false information to a judge or magistrate." U.S.S.G. § 3C1.1, cmt. n.3(f).

Here, Defendant twice provided false information to the Court—in the notarized affidavit he filed with the court and in his trial testimony, in which he attempted to falsely exculpate co-defendant Brown. It is well-established that the enhancement applies where, as here, "[t]he defendant lied about another's involvement in the crime," *United States v. Clark*, 580 F. App'x 153, 154 (4th Cir. 2014) (citing *United States v. Dyer*, 910 F.2d 530, 533 (8th Cir. 1990)); *United States v. Fleming*, 972 F.2d 343 (4th Cir. 1992) ("Obstruction of justice can include misleading or false information given by a defendant about a codefendant's involvement in the offense" (citing *Dyer*, 910 F.2d 530 and *United States v. Williams*, 922 F.2d 737 (11th Cir. 1991)).

For purposes of the enhancement under 3C1.1, a defendant obstructs justice if, for example, he provides "false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 (1993); *accord United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011).

Before applying a sentencing enhancement for obstruction of justice, the court must find by a preponderance that the defendant: "(1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002) (citations omitted). The sentencing court also "must specifically identify the perjurious statements and make a finding either as to each element of perjury or 'that encompasses all of the factual predicates for a finding of perjury.'" *United States v. Akinkoye*, 185 F.3d 192, 205 (4th Cir. 1999) (quoting *United States v. Gordon*, 61 F.3d 263, 270 (4th Cir. 1995)); *see also Dunnigan*, 507 U.S. at 95 (providing an example of acceptable specificity when the court stated that "the defendant was untruthful at trial with respect to material matters," and that this untruthfulness was "designed to substantially affect the outcome of the case").

This standard is easily satisfied here. Defendant repeatedly provided false testimony under oath concerning Demar Brown's purported non-involvement in the burglaries charged in the Indictment. Among other things, he falsely claimed that Brown was not with him and Beckles in Georgia on the evening on January 24, 2018 when three homes were burglarized.[4] He falsely claimed that he, Beckles, and an individual named "Aubrey" burglarized a home in Baltimore County on January 25, 2018. And when played an audio recording of a two-way radio transmission that was captured from that night, Defendant falsely testified that one of the voices on the radio transmission sounded like "Aubrey."

Defendant also falsely testified that "Aubrey"—not Brown—was involved with the burglaries that led up to the arrests of all three Defendants on the evening of January 26, 2018.

---

[4] The fruits of the burglaries were found in Brown's hotel room at the Days Inn in Towson and the Ford Explorer Brown was driving shortly before his arrest.

He falsely testified that that Brown only arrived on scene after the three of them (Fields, Beckles, and "Aubrey") may have been spotted.  Defendant falsely testified that he distracted Brown while Beckles loaded stolen property into Brown's Ford Explorer.  And Defendant falsely testified that Room 127 of the Days Inn was not Mr. Brown's room but rather a room used to stash stolen goods by the *actual* burglars.

All of this testimony was material; indeed, "if believed, would tend to influence or affect the issue under determination," U.S.S.G. § 3C1.1 cmt. n.6—Brown's guilt or innocence.  And there can be no doubt that Defendant's false trial testimony was willful.  *See United States v. Romulus*, 949 F.2d 713, 717 (4th Cir. 1991) ("In order to have acted willfully within the meaning of this guideline, a defendant must consciously act with the purpose of obstructing justice."); *see also United States v. Andrews*, 808 F.3d 964, 971 (4th Cir. 2015) (applying enhancement and reasoning that "[r]ecollection is by nature an imprecise and uncertain exercise, and faulty recall is far different from deliberate deception.").  Indeed, Defendant's purpose—to exculpate Brown through false testimony—was clear and consistent for years.  He filed his affidavit under oath, falsely claiming "that Demar Brown was not a co-conspirator in any of these burglaries and was never around when Kamar, his friend and I broke into some of the homes in Towson," ECF No. 49, in November 2018, and his trial testimony was largely consistent with the content of the affidavit.  The enhancement under U.S.S.G § 3C1.1 thus applies.

### D.  Lack Of Acceptance Of Responsibility

Finally, no downward adjustment pursuant to U.S.S.G. § 3E1.1 is applicable inasmuch as Defendant has not clearly demonstrated acceptance of responsibility for his criminal conduct.  As an initial matter, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 app. n.2.  Of course, Defendant put the Government to its burden at trial here.

Further, "a determination that a defendant has accepted responsibility *will be based primarily upon pre-trial statements and conduct*." U.S.S.G. § 3E1.1 app. n.2 (emphasis added).  Here, Defendant's pre-trial statements and conduct were obstructive—in particular his filing of a false affidavit with the court.

Application Note 4 to U.S.S.G. § 3E1.1 provides:

> *Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.* There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

U.S.S.G. § 3E1.1 app. n.4 (emphasis added).  No such circumstances are present here.

"In all but extraordinary cases, a defendant who receives an enhancement in his sentence for obstruction of justice is ineligible for a reduction for acceptance of responsibility." *United States v. Endicott*, 9 F. App'x 179, 180 (4th Cir. 2001).  Defendant bears the "burden of proving the extraordinary nature of his . . . case where obstruction of justice has occurred." *United States v. Cobb*, No. 18-1522, 2019 WL 1199593, at *3 (6th Cir. Mar. 13, 2019) (citing *United States v. Jeross*, 521 F.3d 562, 581 (6th Cir. 2008)).  Defendant does not and cannot meet that burden.  In sum, Defendant's conduct does not warrant a reduction under § 3E1.1.

### E.  Guideline Range

Defendant is a Criminal History Category I.  PSR ¶ 141.  Based upon a total offense level of 26 and a criminal history category of I, the guideline imprisonment range is 63 months to 78 months. However, since the statutorily authorized maximum sentence of five years is less than

the minimum of the applicable guideline range, the guideline term of imprisonment is 60 months. U.S.S.G. §5G1.1(a)

### III.  Sentencing Factors Under 18 U.S.C. § 3553(a)

The sentencing factors under 18 U.S.C. § 3553(a) strongly weigh in favor of the Government's recommended sentence of five years' imprisonment.

As for the nature and circumstances of the offense, there is no question they are serious. Over a period of two months, Defendant was part of a criminal conspiracy that involved the burglary of 20 homes in two states and the theft of hundreds of thousands in dollars in property. Defendant himself was involved with the burglary of six homes—three in Georgia on the evening of January 24, 2018 and three in Baltimore County (spanning the evenings of January 25, 2018 and January 26, 2018). The Defendant and his co-conspirators stole items of significant monetary and sentimental value from their victims; for some victims, the property—which includes irreplaceable items such as gifts from deceased loved ones and mementos from a child's baptism and first communion—was never recovered.

Equally important to the community and the Government is the impact these burglaries had on the victims' sense of security. The string of burglaries perpetrated by the Defendants had entire communities in Baltimore County on edge and in fear. Many of the victims in this case have expressed that the Defendants stole their and their families' sense of security—the concept of feeling safe in their own homes—and that that sense of security has yet to return. As a result their actions, the Defendants forever changed their victims' lives. Indeed, based on the victim impact statements provided to the Court, the victims' lives have been dramatically impacted as a result of Defendant and his co-conspirators' conduct.

- E.Y., whose home was burglarized on November 29, 2017, wrote: "We still feel unsafe in our own house despite having the latest security system. My wife still sees nightmares about the burglary and still cannot talk about it. I still worry about leaving her and my daughter alone at home. There is nothing worse than feeling unsafe in your own house." Ex. 1.

- K.H, whose home was burglarized on January 10, 2018, wrote about the impact of the burglary on her young children. She wrote regarding one of her children: "This burglary took her fearlessness. It taught her fright and panic. It planted a seed of fear that grew to an understanding that people can and do invade your home. . . . If you could only have felt her fear, then you would know what the burglary has done to her." Ex. 2.

- A.P., whose home was burglarized on January 10, 2018, wrote: "It is very traumatic to have your house, your safe place in life violated. It makes you feel vulnerable. If your safe space is violated then where is actually safe: The answer is <u>nowhere</u>!" A.P. noted that his children "were afraid to both stay and leave the house for months." Ex. 3.

- L.P. and S.G., whose homes were burglarized on January 19, 2018, had similar reflections. L.P. noted that "our family is in a constant state of 'high alert'. Everyone is constantly double-checking locks, alarms and security video footage. Everyone is on edge." She noted further that "I no longer sleep well at night, nor allow any of my kids to be alone in the house." Ex. 4. Meanwhile, S.G. stated that he "[f]elt unsafe sleeping and leaving my home unattended." Ex. 5.

- F.G., whose home was burglarized by Defendant on January 24, 2018, noted "One of the safest places on earth that we have is our home. We no longer feel is safe." And he further noted that he and his family no longer leave "our home alone for extended periods

of time," and how is wife and daughters no long want to be at home by themselves anymore. Ex. 6.

- V.G., whose home was burglarized on January 25, 2018, wrote: "The burglary left me more fearful. . . . I do not leave my home for vacation unless someone stays in my home." She further noted that "I felt very violated that someone would steal things that were very special to me. Some of these items I have worked my whole life for." Ex. 7.

- S.M., whose home was burglarized on January 26, 2018, wrote: "Part of me wants to move on and not think about it and allow the past to be in the past, however I have to say that every time I leave the house, or lock up at night I think of the potential to be broken into and that stems from the night that these three men took the sense of security away from my family and I. One of the things that I won't ever be able to get past is that the timing of when my wife and two young girls left the house that night and when we were broke into seems to coincide. I have this thought of them watching my family leave in the car and that is troublesome beyond belief." Ex. 8.

Relatedly, the cascading effects of the incidents at issue here cannot be understated. S.G. sold his home and moved as a result of the incident, noting that "[l]iving in my home became a source of feeling unsafe. Had to sell and move." A.P. noted that he felt the need to arm himself in his own home, eating dinner every night "with a firearm close by." Ex. 3. Likewise, T.M., whose home was burglarized on December 29, 2017, noted to undersigned counsel that to this day, she sleeps with a metal rod under pillow for protection, fearing that her home will be burglarized again.

A five year sentence is also sufficient (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, and (C) to protect the public from further crimes of Defendant.

As an initial matter, far from reflecting anomalous or aberrant behavior, Defendant and his conspirators' burglaries (and the transportation of the fruit of those burglaries across state lines) reflected substantial premeditation, execution, and a series of deliberate choices. The sheer number of burglaries (20 over a two month period) makes plain that the burglaries and this Defendant's choice to join the conspiracy and take part in the burglaries did not reflect some sort of aberration or hasty decision—underscoring the seriousness of the offense. Indeed, text messages between Defendant and Brown that were introduced as an exhibit at trial indicate that Defendant Brown were discussing a burglary in Georgia—one not charged in this case—on November 20, 2017. *See* Ex. 9 (Trial Exhibit 63F) (Brown tells Fields he is "still mad about leaving GA empty handed"; Fields responds that he has to get his "shit together cause I know we both needed it but I guess that I would have felt more comfortable with 3").

The five year sentence recommended by the Government reflects the seriousness of the offense, taking into consideration the effect it had on the victims; it likewise provides just punishment for Defendant's offense. The victim impact statements indicate what certain of the victims view as just punishment in light of the offense. Ex. 3 (A.P.) ("The longer their sentence, the safer people will be. . . . They may only take things but they change lives."); Ex. 1 (E.Y.) ("I am hopeful that the court will consider the highest limits in sentencing in this case."); Ex. 5 (S.G.) ("Maximum. We need to send a message that there are consequences for your actions. We all wake up with two things. A choice and a consequence. Multiple choices were made to invade people's homes on multiple occasions. Certainly the defendants freely made those choices."); Ex. 4 (L.P.) ("I hope they will offer classes to give him a skill once he is let out of jail."); Ex. 6 (F.G.) ("We forgive them. They should receive the fair punishment that the law

gives for the crimes they have committed."); Ex. 7 (V.G.) ("I believe there may be an opportunity for personal growth, change in value system + desire to work in a profession that offers noble and righteous living given <u>appropriate sentencing time</u>!!").

As for the need to promote respect for the law, this factor is particularly important here—not only in light of the serious criminal conduct for which Defendant was convicted, but also in light of his conduct at trial. Simply put, Defendant repeatedly perjured himself during his testimony at trial and attempted to subvert the truth-seeking process. Though his false testimony at trial (and the false affidavit he filed with the court years before trial), he attempted to manipulate a trial's "most basic and essential purpose, that of reaching a true and accurate judgment at once fair to the interests of society and the rights of those accused." *Andrews*, 808 F.3d at 971.

Indeed, Defendant deliberately and repeatedly attempt to mislead the jury during trial evincing a disrespect for the solemnity of the oath he gave to tell the truth and a disregard for the importance of maintaining the integrity of the judicial process. What's more, that Defendant continued his lies at trial—years after filing his false affidavit with the court—underscores how deliberately he acted, and why his conduct cannot be excused by any suggestion that his behavior at trial reflected some sort of panic or a hastily made mistake. The statutory maximum sentence of five years' imprisonment is particularly appropriate in light of the need to promote respect for the law.

Regarding general deterrence, the Government's recommended sentence will serve to deter others who may consider burglary as way to obtain money or valuable property quickly. And hopefully it will be sufficient to deter Defendant himself from engaging in further criminal activity.

Finally, Defendant's history and characteristics do not weigh in favor of a variant sentence. Though Defendant—like so many criminal defendants that appear in federal court—grew up in a "rough neighborhood," he described is upbringing as "good." PSR ¶ 149. He has a high school diploma and attended some college. PSR ¶ 159. And Defendant had a job at time the burglaries at issue here. PSR ¶ 162. The Court should consider these facts in imposing the sentence too.

### IV. The Government's Sentencing Recommendation

For all of these reasons, the Court should impose a sentence of five years' imprisonment and enter an order directing that property stolen by Defendants (and still in the possession of law enforcement) be returned to victims from whom the property was stolen.[5]

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    /s/
       Paul Riley
       Christopher Rigali
       Assistant United States Attorneys

cc:    Alfred Guillaume. Esq. (by ECF)
       Manisha Garner, U.S. Probation Officer (by electronic mail)

---

[5] The Government will provide the Court with a proposed order in advance of sentencing.